JAN ELIZABETH VAN DUSEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20767–08.        Filed June 2, 2011.

P incurred unreimbursed volunteer expenses while caring for foster cats in her private residence. P's expenses consisted primarily of payments for veterinary services, pet supplies, cleaning supplies, and household utilities. P claimed a $12,068 charitable-contribution deduction for the expenses on her 2004 tax return. R issued a notice of deficiency denying the deduction. R claims that P did not render services to a qualifying charitable organization under sec. 170(c), I.R.C., and that P failed to substantiate her expenses under sec. 170(f)(8), I.R.C., and sec. 1.170A–13, Income Tax Regs. R also asserts that P's expenses have an indistinguishable personal component. *Held*: P's foster-cat expenses qualify as unreimbursed expenditures incident to the rendition of services to a charitable organization. See sec. 1.170A–1(g), Income Tax Regs. P's services were directed by a charitable organization. P thus rendered services to a sec. 170(c), I.R.C., organization when she cared for foster cats in her home. Some of P's expenses are disallowed because they are insufficiently related to foster-cat care or cannot be determined with precision. *Held*, *further*, the recordkeeping requirements of sec. 1.170A–13(a), Income Tax Regs. (for contributions of money), govern unreimbursed volunteer expenses of less than $250. *Held*, *further*, P's records meet the requirements of sec. 1.170A–13(a), Income Tax Regs., because they are acceptable substitutes for canceled checks under the substantial compliance doctrine. See *Bond v. Commissioner*, 100 T.C. 32 (1993). P can deduct foster-cat expenses of less than $250. *Held*, *further*, P cannot deduct foster-cat expenses of $250 or more. P did not obtain the contemporaneous written acknowledgment from the charitable organization required under sec. 1.170A–13(f)(10), Income Tax Regs. *Held*, *further*, P can deduct a $100 check donation made to a separate charitable organization.

Jan Elizabeth Van Dusen, pro se.

*Christina E. Ciu* and *Rebecca Duewer-Grenville*, for respondent.

MORRISON, *Judge*: The Commissioner of Internal Revenue (the IRS) issued a notice of deficiency for the tax year 2004 to petitioner, Jan Elizabeth Van Dusen, determining an income-tax deficiency of $4,838. The parties settled all issues except those relating to a $12,068 charitable-contribution deduction for Ms. Van Dusen's expenses of taking care of foster cats.[1]

We find that taking care of foster cats was a service performed for Fix Our Ferals, a section 501(c)(3)[2] organization that specializes in the neutering of wild cats. See *infra* part I. Some of Van Dusen's expenses are categorically not related to taking care of foster cats and are therefore not deductible. These expenses are the cost of cremating a pet cat, bar association dues, and DMV fees. See *infra* part II. Some of Van Dusen's other expenses are not solely attributable to foster-cat care and are not deductible. These expenses are the cost of repairing her wet/dry vacuum and her membership dues at a store. See *infra* part III. Other expenses are attributable to the services Van Dusen provided to Fix Our Ferals. These expenses are 90 percent of her veterinary expenses and pet supplies and 50 percent of her cleaning supplies and utility bills. See *infra* part IV.B. Some payments to Orchard Supply Hardware and Lowe's for pet supplies, however, are disallowed because the amounts spent on pet supplies cannot be determined with precision. See *infra* part IV.A. In deciding whether Van Dusen kept adequate records of the expenses attributable to her volunteer services, we hold that the regulatory requirements for money contributions govern Van Dusen's expenses of less than $250. See *infra* part IV.C.1.a. Van Dusen has met the requirements for these less-than-$250 expenses. Her records are acceptable substitutes for canceled checks under the substantial compliance doctrine. See *infra* part IV.C.1.b. For expenses of $250 or more, however, Van Dusen does not have contemporaneous written acknowledgment from Fix Our Ferals. See

---

[1] The charitable-contribution deduction for foster-cat expenses was the only item the parties presented for decision. The record, however, includes documentation of four expenses that are unrelated to foster-cat care. These expenses are: the cost of cremating a pet cat, bar association dues, DMV fees, and a $100 check to Island Cat Resources and Adoption. Van Dusen testified about the pet cat cremation and the $100 check to Island Cat Resources and Adoption, but not the bar association dues or DMV fees. We address all of these expenses for the sake of completeness.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

*infra* part IV.C.2. Therefore, these expenses are not deductible.

We also hold that Van Dusen is entitled to a $100 deduction for a check donation to Island Cat Resources and Adoption, a section 170(c) organization. See *infra* part VI.

### FINDINGS OF FACT

We adopt the stipulation of facts and its attached exhibits. Van Dusen, a resident of Oakland, California, is an attorney who cared for cats in her private residence in 2004. Van Dusen volunteered for an organization called Fix Our Ferals and argues that her out-of-pocket expenses for caring for cats qualify as charitable contributions to that organization. The parties stipulate that Fix Our Ferals is a section 501(c)(3) organization. We find that Fix Our Ferals is eligible to receive tax-deductible contributions under section 170(c). [3]

### *Fix Our Ferals and Trap-Neuter-Return*

Fix Our Ferals' mission is to engage in "trap-neuter-return" activities, which consist of trapping feral cats, [4] neutering [5] them, obtaining necessary medical treatments and vaccinations, and releasing them back into the wild. [6] Fix Our Ferals enlists volunteers to perform these tasks. The volunteers usually return cats to their original neighborhoods, but sometimes cats are moved to safer neighborhoods.

The purpose of trap-neuter-return is to humanely control feral cat populations and ensure that the cats live in an environment where people are not hostile to them. Fix Our Ferals periodically organizes spay/neuter clinics and educates the public about trap-neuter-return as a solution to neighborhood cat issues.

---

[3] We take judicial notice of IRS Publication 78, Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986, as effective for 2004. See *Viralam v. Commissioner*, 136 T.C. 151, 154, 176–177 (2011) (citing IRS Publication 78 as evidence of organization's sec. 170(c) status); *Jennings v. Commissioner*, T.C. Memo. 2000–366 (same), affd. 19 Fed. Appx. 351 (6th Cir. 2001). Fix Our Ferals was listed in IRS Publication 78 in 2004.

[4] A feral cat is a nondomesticated cat.

[5] "Neutering" refers to the sterilization of animals of both sexes. We use the term interchangeably with "spay/neuter".

[6] In the context of trap-neuter-return, returning feral cats to the "wild" means returning them to an outdoor living environment that is generally urban or suburban. The intent is for the cats to continue to live in human-populated neighborhoods, rather than move to animal-only habitats.

After being neutered, the cats must be temporarily housed in volunteers' private residences while they recover. After the cats recover and have received all necessary medical treatments, they are usually returned to the wild.

Some cats cannot be safely returned to the wild. Typically those cats are young, sick, injured, elderly, or tame. [7] Those cats must be cared for domestically. We refer to all care for trapped cats, including temporary housing while cats are recuperating from neutering, as "foster care". We refer to cats under foster care as "foster cats".

Some of the cats are not returned to the wild because they are already tame. Volunteers try to tame the other cats that cannot be returned to the wild to make them suitable for adoption. The volunteers then attempt to place the tame cats in no-kill shelters or adoptive homes. The success of placing the tame cats depends on shelter availability and people's willingness to adopt.

Although some of the cats that cannot be returned to the wild are adopted or given to shelters, others remain in foster care indefinitely. More often these cats are sick, elderly, or have other problems requiring long-term care. Fix Our Ferals encourages volunteers to provide long-term care for these cats in their homes. Foster care, both short and long term, forms an important part of the organization's mission.

*Fix Our Ferals' Administrative Structure*

Fix Our Ferals is a decentralized organization. It has no formal administrative office. Instead, it uses a post office box, a telephone hotline, a website, and other internet- and phone-based methods of communication.

Fix Our Ferals' official staff, as far as we can surmise, consists of a board of directors and a team of veterinarians. The organization relies on a base of volunteers who trap cats, transport cats, foster cats, staff spay/neuter clinics, educate the public, screen phone calls, raise funds, and recruit volunteers. Some Fix Our Ferals volunteers are members of an informal internet message group through which they coordinate logistics and assist each other with cat-related issues. Volunteers also collaborate informally with other cat rescue groups and individuals. Fix Our Ferals does not commonly

---

[7] Sometimes volunteers capture tame stray cats when they attempt to trap feral cats.

reimburse volunteers for expenses. It does, however, sometimes provide vouchers for free neutering services. It also reimburses volunteers for emergency care if complications arise after a cat has been neutered at a Fix Our Ferals clinic.

*Van Dusen's Role With Fix Our Ferals*

Van Dusen was a Fix Our Ferals volunteer in 2004. She trapped feral cats, had them neutered, obtained vaccinations and necessary medical treatments, housed them while they recuperated, and released them back into the wild. She also provided long-term foster care to cats in her home. She attempted to place long-term foster cats in one of two no-kill shelters, Berkeley East Bay Humane Society or East Bay Society for the Prevention of Cruelty to Animals,[8] or otherwise find them adoptive homes. Some foster cats, however, stayed with her indefinitely.

In 2004, Van Dusen had between 70 and 80 cats total, of which approximately 7 were pets. The pet cats had names, but the foster cats generally did not. Most cats roamed freely around Van Dusen's home (except for bathrooms) and resided in common areas. Less domesticated cats stayed in a separate room called the "feral room". Some cats lived in cages for taming. Others lived in cages because of illness.

Van Dusen devoted essentially her entire life outside of work to caring for the cats. Each day she fed, cleaned, and looked after the cats. She laundered the cats' bedding and sanitized the floors, household surfaces, and cages. Van Dusen even purchased a house "with the idea of fostering in mind". Her house was so extensively used for cat care that she never had guests over for dinner.

Van Dusen obtained foster cats primarily through the trap-neuter-return work that she personally performed. She captured homeless cats, had them neutered, cared for them during recovery, and if possible, returned them to the wild. She housed the cats that could not be returned to the wild until an adoption opportunity arose. She obtained the rest of her cats through a loose network of contacts. Some came from Fix Our Ferals affiliates or from the Fix Our Ferals hot-

---

[8] Van Dusen and other witnesses sometimes referred to this organization as Oakland Society for the Prevention of Cruelty to Animals.

line or internet message group. Others came from individual volunteers or other cat rescue organizations.

Van Dusen's foster care arrangements arose informally, usually by her personal decision or through a series of phone calls, emails, internet postings, or in-person conversations. Some cats that she cared for in 2004 had been under her care in previous years, during which she belonged to organizations other than Fix Our Ferals. Van Dusen's inability to recall precisely how she acquired each of her cats makes it difficult to ascertain how many cats are attributable to a particular organization or contact person. Although Fix Our Ferals was her primary volunteer affiliation in 2004, she admits that she did sometimes assist other groups that year. Van Dusen therefore cannot trace all her foster cats in 2004 to Fix Our Ferals.

*Van Dusen's Cat-Care Expenses*

Van Dusen paid out-of-pocket for most of her cat-care expenses. Vouchers covered some of the neuterings, but Van Dusen paid all other veterinary expenses including tests, treatment, vaccines, and surgery.

Van Dusen expended significant amounts on in-home care as well. She purchased large quantities of pet supplies[9] and cleaning supplies.[10] She renewed her Costco membership so she could buy cat food and cleaning supplies at lower prices. She repaired her wet/dry vacuum so she could easily clean the floors. Van Dusen incurred higher electricity and gas bills because she laundered many loads of cat bedding and ran a special ventilation system to ensure fresh air. The frequent laundering also increased her water bills. Her garbage bills increased because of the high volume of cat-related waste. We refer to Van Dusen's veterinary, pet supply, cleaning supply, utility, Costco membership renewal, and wet/dry vacuum repair expenses collectively as her "cat-care expenses".

A portion of Van Dusen's cat-care expenses was attributable to personal use, and the rest was attributable to foster cats. We refer to the portion of cat-care expenses attributable

---

[9] "Pet supplies" refers to pet food, pet medicine, woodstove pellets (for cat litter), litter boxes, pet dishes, and other miscellaneous cat-specific supplies.

[10] "Cleaning supplies" refers to garbage bags, paper towels, laundry detergent, dish detergent, and other cat-related supplies that were not exclusively used for cats.

to foster cats as "foster-cat expenses". The precise amount of Van Dusen's foster-cat expenses is unclear because her records do not distinguish personal expenses from foster-cat expenses.[11]

*Van Dusen's Recordkeeping and Reporting*

Van Dusen introduced the following evidence as proof of her foster-cat expenses: check copies,[12] bank account statements, credit card statements, a Thornhill Pet Hospital client account history, a Costco purchase history, Pacific Gas & Electric invoices, a Waste Management payment history (for garbage removal), and an East Bay Municipal Utility District billing history (for water). All the data in the documents was recorded contemporaneously in 2004. Van Dusen states that she initially had more substantial records of her foster-cat expenses, namely itemized receipts, but that her tax preparer, Cary Cheng, told her they were unnecessary for preparing her original return. Those records have since disappeared. Van Dusen compiled the documents she introduced at trial by searching through other records and requesting records from third parties.

On her 2004 tax return, Van Dusen deducted $12,068 on Schedule A, Itemized Deductions, for noncash charitable contributions attributable to a "cat rescue operation". The return stated that the $12,068 comprised $1,381 of supplies,[13] $9,607 of veterinary bills, and $1,080 of utilities. It is unclear precisely how Van Dusen arrived at these numbers. An unnamed friend had totaled the "cat rescue operation" expenses using now-missing receipts, but we have no evidence of what method, if any, her friend used to separate deductible expenses from nondeductible expenses. The friend prepared a worksheet summarizing the calculations, but this document is not in evidence. The IRS disallowed the entire deduction. Van Dusen's petition asserts that she is entitled to a deduction of at least $12,068 for foster-cat expenses. On

---

[11] We address the calculation of foster-cat expenses *infra* pts. III and IV.

[12] We refer to the documents as "check copies" because they are photocopies of carbon copies of the original checks. After writing the checks, Van Dusen presumably kept the carbon copies for her records.

[13] It is unclear whether "supplies" referred to just pet supplies and cleaning supplies or whether it also included the cost of renewing Van Dusen's Costco membership and the cost of repairing her wet/dry vacuum. At trial Van Dusen made clear that she seeks a deduction for all of these expenses—pet supplies, cleaning supplies, Costco membership renewal, and wet/dry vacuum repair.

the basis of her testimony, we believe Van Dusen now seeks a deduction for the expenses using the following percentage estimates: 90 percent of veterinary expenses, pet supplies, paper towels, and garbage bags; and 50 percent of laundry detergent, dish detergent, utilities, and Costco membership renewal. See *infra* part IV.B. Van Dusen also seeks to deduct the cost of her wet/dry vacuum repair, but her percentage estimate for this expense is unclear.

## OPINION

A taxpayer has the burden of proving the IRS's determination of deficiencies incorrect. See Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden shifts to the IRS if the taxpayer introduces credible evidence with respect to a factual issue, the taxpayer has complied with the substantiation requirements of the Internal Revenue Code, the taxpayer has maintained all required records, and the taxpayer has cooperated with reasonable IRS requests for information. Sec. 7491(a). Our conclusions here, however, are based on the preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See *Martin Ice Cream Co. v. Commissioner*, 110 T.C. 189, 210 n.16 (1998).

## I. *Caring for Foster Cats Was a Service to Fix Our Ferals*.

Section 170(a) allows a deduction for any "charitable contribution" made by the taxpayer. A "charitable contribution" is defined as "a contribution or gift to or for the use of" a charitable organization. Sec. 170(c). A typical charitable contribution is donating money or property directly to a charitable organization. A second type of charitable contribution is placing money or property in trust for a charitable organization. Such a transfer is, in the words of section 170(c), a contribution "for the use of" a charitable organization. See *Davis v. United States*, 495 U.S. 472, 485 (1990). A third type of charitable contribution occurs when a taxpayer performing services for a charitable organization incurs unreimbursed expenses. As section 1.170A–1(g), Income Tax Regs., states: "No deduction is allowable under section 170 for a contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization con-

tributions to which are deductible may constitute a deductible contribution." [14]

Van Dusen did not contribute money or property directly to Fix Our Ferals. Van Dusen did not place property in trust for Fix Our Ferals or enter into a formal arrangement giving the organization legal rights to her property. Instead she paid third parties for veterinary services, pet supplies, cleaning supplies, utilities, Costco membership renewal, and wet/dry vacuum repair. Thus Van Dusen is entitled to a charitable-contribution deduction only if these expenses were, in the words of section 1.170A–1(g), Income Tax Regs., "expenditures made incident to the rendition of services" to Fix Our Ferals.

The IRS contends that Van Dusen was an independent cat rescue worker whose services were unrelated to Fix Our Ferals and did not benefit the organization. We reject this assertion, finding that Van Dusen's care for foster cats constituted services to Fix Our Ferals.

In determining whether a taxpayer has provided services to a particular organization, courts consider the strength of the taxpayer's affiliation with the organization, the organization's ability to initiate or request services from the taxpayer, the organization's supervision over the taxpayer's work, and the taxpayer's accountability to the organization. See, e.g., *Smith v. Commissioner*, 60 T.C. 988 (1973); *Saltzman v. Commissioner*, 54 T.C. 722 (1970). For example, *Smith v. Commissioner*, *supra* at 993–995, held that church members could deduct evangelism travel expenses even though their church never initiated, controlled, supervised, or assisted with the trips. The church encouraged missionary work in general; and before the taxpayers embarked on a trip, the church gave them letters of commendation, which evidenced the church's approval and served as introductions to intrafaith groups during the trip. *Id.* at 993. Additionally, after each trip the church members reported back to the

---

[14] The expenses of rendering services are deductible because they constitute contributions "to" the charitable organization. *Rockefeller v. Commissioner*, 676 F.2d 35, 42 (2d Cir. 1982) (in determining whether unreimbursed volunteer expenses were governed by a statutory provision of the 1954 Code that treated favorably contributions "to" a charitable organization, court held that unreimbursed volunteer expenses were contributions "to"—not "for the use of"—a charitable organization), affg. 76 T.C. 178 (1981); see also *Davis v. United States*, 495 U.S. 472, 486–488 (1990) (in holding that no deduction is available when a taxpayer pays a service provider's expenses, Court stated that unreimbursed expenses of rendering services are contributions "to" a charitable organization within the meaning of section 170(c)).

church, which then publicized their efforts and accomplishments to other congregations. *Id.* By contrast, in *Saltzman v. Commissioner*, *supra*, the taxpayer's activities had much looser ties to the charitable organization. The taxpayer was the leader of the Harvard-Radcliffe Hillel Folk Dance Group. *Id.* at 722. Without the organization's asking him, he traveled alone to Europe and Pittsburgh to attend folk dance festivals that were not sponsored by the organization. *Id.* at 723. We held that the taxpayer had not provided services to the organization, partly because the organization had not directed or encouraged him to attend the festivals. *Id.* at 724.

Van Dusen has demonstrated a strong connection with Fix Our Ferals. She was a regular Fix Our Ferals volunteer who performed substantial services for the organization in 2004. She engaged in both trapping and foster care and worked closely with other Fix Our Ferals volunteers. Fix Our Ferals could initiate or request services from Van Dusen through individual volunteers, who would contact her by phone or by internet.[15] Like the church in *Smith*, Fix Our Ferals encouraged and indirectly oversaw Van Dusen's work. See *Smith v. Commissioner*, *supra* at 994 ("Nothing in section 170 or in section 1.170–2(a)(2) of the regulations * * * suggests that, as a condition to the deductibility of unreimbursed, service-related expenses, the services must be performed under the control or supervision of the charitable organization.").[16]

Van Dusen's inability to trace her cat rescue work exclusively to Fix Our Ferals does not pose an insurmountable bar to deductibility. We find that she performed most of her work in 2004 for Fix Our Ferals. Moreover, all of the other organizations with which she was affiliated, and therefore to which she may have provided services, qualify as section 170(c) organizations.[17]

---

[15] Fix Our Ferals volunteers regularly received requests for assistance and would solicit help from other volunteers on behalf of third parties. If volunteers encountered problems during their work, they would also contact other volunteers for assistance.

[16] Sec. 1.170–2(a)(2), Income Tax Regs., was the predecessor to sec. 1.170A–1(g), Income Tax Regs., the provision that currently allows taxpayers to deduct unreimbursed volunteer expenses.

[17] These organizations are: Island Cat Resources and Adoption, Berkeley East Bay Humane Society, East Bay Society for the Prevention of Cruelty to Animals, and Second Chance Cat Rescue. All of these organizations were listed in IRS Publication 78 in 2004. See *Jennings v. Commissioner*, T.C. Memo. 2000–366 (concluding that donees were not sec. 170(c) organizations because they were not listed in IRS Publication 78); *supra* note 3 (taking judicial notice of IRS Publication 78, a cumulative list of sec. 170(c) organizations).

The IRS also contends that even if Van Dusen was affiliated with Fix Our Ferals, Fix Our Ferals' mission consists solely of "education and sterilization", and therefore fostering cats could not constitute services to Fix Our Ferals. As our fact findings explained, however, the organization's mission encompasses foster care. Fix Our Ferals actively recruits volunteers to foster cats during spay/neuter recovery, and it encourages volunteers to provide sanctuary for cats requiring long-term care. Thus Van Dusen served Fix Our Ferals' mission by fostering cats. The remainder of this Opinion considers which of Van Dusen's expenses are deductible as incidental to foster-cat volunteer work.

## II. *Pet-Cat Cremation Expense, Bar Association Dues, and DMV Fees*

As we have found, Van Dusen rendered services to Fix Our Ferals. To be deductible, unreimbursed expenses must be directly connected with and solely attributable to the rendition of services to a charitable organization. E.g., *Saltzman v. Commissioner*, 54 T.C. at 724; *Babilonia v. Commissioner*, T.C. Memo. 1980–207, affd. per curiam 681 F.2d 678 (9th Cir. 1982). In applying this standard, courts have considered whether the charitable work caused or necessitated the taxpayer's expenses. For example, in *Orr v. United States*, 343 F.2d 553, 557–558 (5th Cir. 1965), the court disallowed deductions for the expenses of insuring and repairing two vehicles because the expenses were not solely attributable to charitable use. The taxpayer had used the vehicles partly for personal use and would have incurred the expenses regardless of any charitable work. *Id.* Similarly, in *McCollum v. Commissioner*, T.C. Memo. 1978–435, we denied National Ski Patrol volunteers' deductions for ski equipment because the volunteers owned the equipment and could use it for personal recreation. We also denied deductions for motor home use and food given to non-volunteering family members. *Id.* And in *Smith v. Commissioner*, 60 T.C. at 995, we disallowed meal, laundry, and camping expenses incurred for non-proselytizing children who had accompanied the taxpayers on an evangelical mission.

Van Dusen's documentation includes the following non-foster-cat expenses: an $85 credit card charge to Bubbling

Well Pet Memorial, a $170 check to the California State Bar Association, and a $146 check to the "DMV". The $85 charge to Bubbling Well Pet Memorial is not deductible because this expense was for the cremation of a pet cat. The checks to the California State Bar Association and the DMV are not deductible because they are not charitable expenses.

III. *Costco Membership Dues and Wet/Dry Vacuum Repair*

Van Dusen has not shown that any portion of her Costco membership dues or wet/dry vacuum repair costs constitutes an exclusively charitable expense. Like the vehicles in *Orr v. United States*, *supra*, the Costco membership and the wet/dry vacuum served both personal and charitable purposes. We conclude that Van Dusen would have paid for her Costco membership and repaired her vacuum even if she had not fostered cats. Thus these expenses were not directly connected with and solely attributable to charitable activities.

IV. *Veterinary Expenses, Pet Supplies, Cleaning Supplies,* [18] *and Utilities*

One broad category of Van Dusen's expenses—veterinary expenses, pet supplies, cleaning supplies, and utilities—was partly incidental to her services to Fix Our Ferals. If Van Dusen had not fostered cats, she would have paid for fewer veterinary services, fewer pet supplies, and fewer cleaning supplies. Her utility bills would have been significantly lower because she would not have had to run a special ventilation system, do as much laundry, or dispose of as much cat waste. We find that the portions of these expenses attributable to caring for foster cats were directly connected with and solely attributable to Van Dusen's services to Fix Our Ferals.

A. *Some Payments to Orchard Supply Hardware and Lowe's Must Be Categorically Disallowed*.

Van Dusen purchased bags of woodstove pellets from Orchard Supply Hardware and Lowe's. She used woodstove pellets as cat litter. Unfortunately, Van Dusen's documents show only the total payment she made for each visit to these stores. Her documents do not reveal what items she pur-

---

[18] See definitions of "pet supplies" and "cleaning supplies", *supra* notes 9 and 10.

chased.[19] Thus the documents alone do not show how much she spent on pellets. She does not claim that she purchased any other items whose costs would be deductible. We therefore must determine, on the basis of her testimony, what portions of her payments to the two stores were for pellets.

In determining the amounts that Van Dusen spent on pellets from Orchard Supply Hardware and Lowe's, we divide her shopping trips to these stores into two types. With the first type of shopping trip, the amount of each payment was an exact multiple of $4.55625, the price of one bag of pellets.[20] The payments for this type of trip are:

- check nos. 1405, 1421, 1433, 1451, and 1461; and

- Orchard Supply Hardware purchases on October 12, October 19, November 22, and November 30, 2004, as reflected in Van Dusen's bank statements.

We believe that, on the first type of shopping trip, Van Dusen indeed purchased bags of pellets and nothing else.

With the second type of shopping trip, the amount of each payment was not an exact multiple of the $4.55625 price of a bag of pellets. For each trip, Van Dusen testified as to how much she spent on pellets. She claimed that she either (1) purchased eight bags of pellets for $36.45 ($4.55625/bag × 8 bags), or (2) purchased the maximum number of bags of pellets that could have been purchased with the dollar amount spent.[21] While we generally find Van Dusen a credible witness, Van Dusen provides no basis for us to presume that every trip involved the purchase of either (1) eight bags of pellets, or (2) as many bags of pellets as could be purchased

---

[19] Van Dusen had other payees besides Orchard Supply Hardware and Lowe's. For one of the other payees—Costco—Van Dusen introduced a document that described each item she purchased. For the other payees, Van Dusen does not have documents showing what items she purchased, but this fact is insignificant because it is evident that the payments were entirely related to cat care. For example, her payments to a veterinarian were entirely for cat medical care.

[20] We determined the per-bag cost of pellets by dividing $36.45 by 8. Van Dusen testified credibly that the cost of eight bags of pellets in 2004 was $36.45. This amount appeared frequently in her documentation as the amount she paid to Orchard Supply Hardware. We believe that the amount $36.45 includes the sales tax on the purchase, which is why dividing $36.45 by 8 yields a number that includes a fraction of a penny (as opposed to a round number).

[21] For instance, check no. 1341 shows Van Dusen paid $33.52 to Orchard Supply Hardware. Van Dusen testified that on the check no. 1341 shopping trip, she bought seven bags of pellets for $31.90 (and presumably spent the remaining $1.62 on other things). She apparently computed the $31.90 amount by multiplying $4.55625 by 7. The product of 7 and $4.55625 turns out to be $31.89375, which, rounded to the nearest cent, is $31.89.

by the payment amount reflected on her documentation. [22] Therefore, we exclude the following payments from calculation:

• check nos. 1215, 1225, 1234, 1253, 1289, 1335, 1341, 1351, 1368, 1382, 1389, and 1478;

• Orchard Supply Hardware purchases on May 15 and June 6, 2004, as reflected in Van Dusen's credit card statements; [23] and

• an Orchard Supply Hardware purchase on October 6, 2004, as reflected in Van Dusen's bank statements.

### B. *Percentages of Veterinary Expenses, Pet Supplies, Cleaning Supplies, and Utility Bills Attributable to Foster-Cat Care*

Of the expenses for veterinary care, pet supplies, cleaning supplies, and household utilities, we have explained that some of the expenses (i.e., some of the Orchard Supply Hardware and Lowe's purchases) must be disallowed entirely. Of the remaining amounts, we must consider what portions were attributable to foster-cat care. Van Dusen estimates that foster cats were responsible for the following percentages of expenses:

• 90 percent of veterinary expenses,
• 90 percent of pet supplies,
• 90 percent of paper towels and garbage bags,
• 50 percent of laundry detergent and dish detergent, and
• 50 percent of household utility bills. [24]

Van Dusen's percentage estimates for veterinary expenses and pet supplies are reasonable. Van Dusen had about 7 pet cats and 70 to 80 total cats in 2004. In general, the cat-care costs were distributed equally among pet cats and foster cats. [25] Thus we conclude that approximately 90 percent of

---

[22] We believe Van Dusen chose eight bags of pellets as an estimate because the cost of eight bags—$36.45—is the most common amount in her documentation for Orchard Supply Hardware purchases. However, we are not convinced that Van Dusen purchased eight bags of pellets so regularly that $36.45 can be used as a default estimate for shopping trips.

[23] Unless otherwise stated, dates regarding Van Dusen's credit card statements refer to the transaction date, not the posting date.

[24] Van Dusen also estimates that 50 percent of the cost of her Costco membership renewal was attributable to foster cats. We do not discuss the Costco membership renewal here because we find that no portion of it was attributable to foster cats. See *supra* pt. III. For the same reason, we do not discuss the wet/dry vacuum repair (for which Van Dusen's percentage estimate is unclear).

[25] Van Dusen testified that the foster cats caused a disproportionate amount of the veterinary expenses. However, she has not indicated a basis for determining the precise percentage of vet-

the veterinary and pet supply expenses was attributable to foster cats.

We determine that 50 percent of Van Dusen's cleaning supply and utility expenses was attributable to foster cats. Van Dusen believes the foster cats actually accounted for around 75 percent, 80 percent, or even 90 percent of her cleaning and utility expenses. However, she cannot prove precisely how much the foster cats contributed to these expenses. We determine that all the cleaning supplies—paper towels, garbage bags, laundry detergent, and dish detergent—should be counted using the same percentage estimate. Van Dusen has not shown why paper towels and garbage bags had a smaller personal use component than laundry detergent and dish detergent. We consider 50 percent a sufficiently conservative estimate to ensure that no personal expenses are counted. Van Dusen ran a large-scale foster cat operation. The number of cats in her home caused considerable expenses. She laundered bedding several times a week, and she frequently sanitized floors and surfaces. She also ran a special ventilation system and disposed of all cat-related waste. Under these circumstances, it seems highly unlikely that foster cats accounted for less than 50 percent of her cleaning and utility expenses.

We find that 90 percent of the veterinary expenses, 90 percent of the pet supplies, 50 percent of the cleaning supplies, and 50 percent of the utility bills are foster-cat expenses and therefore charitable. These percentage estimates apply to Orchard Supply Hardware and Lowe's expenses only to the extent that Van Dusen's documentation provides a precise amount for each cat-care expense. See *supra* part IV.A. The table below lists Van Dusen's payees and the expense category into which we classify Van Dusen's payments to them (i.e., veterinary expenses, pet supplies, cleaning supplies, or utilities):

| *Payee* | *Foster-cat expense category* |
| --- | --- |
| Thornhill Pet Hospital | Veterinary expenses |
| St. Louis Vet Clinic | Veterinary expenses or pet supplies[1] |
| Bay Area Veterinary Specialist | Veterinary expenses |
| Berkeley Dog and Cat Hospital | Veterinary expenses |

erinary expenses attributable to foster cats. We therefore treat veterinary expenses as if they were incurred proportionally between pet cats and foster cats.

| *Payee* | *Foster-cat expense category* |
|---|---|
| Deanne Jarvis | Veterinary expenses |
| Revival Animal Health | Veterinary expenses or pet supplies[1] |
| Orchard Supply Hardware | Pet supplies |
| Lowe's | Pet supplies |
| Pet Vet Pet Food | Veterinary expenses or pet supplies[1] |
| Pet Club | Pet supplies |
| Costco | Pet supplies or cleaning supplies (item by item) |
| Pacific Gas & Electric | Utilities |
| Waste Management | Utilities |
| East Bay Municipal Utility District | Utilities |

[1] It is unnecessary to determine the precise category under which each payment falls because both veterinary expenses and pet supplies are 90 percent charitable.

Van Dusen's foster-cat expenses, however, are deductible only to the extent that she has substantiated them, a point we consider next.

C. *Whether Van Dusen's Expenses Are Adequately Substantiated*

Charitable deductions are subject to the recordkeeping requirements of section 1.170A–13(a), Income Tax Regs., for contributions of money, or section 1.170A–13(b), Income Tax Regs., for contributions of non-money property. Contributions of $250 or more must satisfy not only these recordkeeping requirements, but also the requirements of section 1.170A–13(f)(1), Income Tax Regs.[26] Therefore, we divide Van Dusen's expenses into expenses of less than $250 and expenses of $250 or more. We evaluate whether each expense satisfies the requirements for its category.

1. *Van Dusen Has Met the Recordkeeping Requirements for Her Foster-Cat Expenses of Less Than $250.*

a. *Unreimbursed Volunteer Expenses of Less Than $250 Are Governed by Section 1.170A–13(a), Income Tax Regs., Not Section 1.170A–13(b), Income Tax Regs.*

Section 1.170A–13, Income Tax Regs., divides contributions of less than $250 into only two categories: "contributions of

[26] The requirements of sec. 1.170A–13(f)(1), Income Tax Regs., do not apply to separate contributions of less than $250 made to the same donee, even if the aggregate donations to the donee exceed $250 within the same taxable year.

money" and "contributions of property other than money".
See sec. 1.170A–13(a) and (b), Income Tax Regs. The regula-
tions do not expressly state whether a contribution through
the payment of unreimbursed volunteer expenses is subject
to the requirements for contributing money set forth in sec-
tion 1.170A–13(a), Income Tax Regs., the requirements for
contributing non-money property set forth in section 1.170A–
13(b), Income Tax Regs., or neither set of requirements. The
idea that unreimbursed volunteer expenses are free from
recordkeeping requirements is implausible. Therefore, one of
the two sets of rules must govern those expenses.

Of the two sets of recordkeeping rules, we hold that section
1.170A–13(a), Income Tax Regs.—which sets forth the record-
keeping rules for money contributions—contains the relevant
rules for determining whether unreimbursed volunteer
expenses are deductible. These rules, and not the rules for
non-money contributions, apply to unreimbursed volunteer
expenses for several reasons.[27] First, the substantiation
requirements for expenses of $250 or more, which are found
in section 1.170A–13(f)(10), Income Tax Regs., implicitly cat-
egorize unreimbursed expenses as cash contributions by sub-
jecting them to the requirements of section 1.170A–13(a),
Income Tax Regs.[28] Second, unreimbursed expenses are
similar to money contributions because taxpayers who serve
as volunteers usually use money to purchase goods or serv-
ices.[29] Third, if the rules for non-money contributions in sec-
tion 1.170A–13(b), Income Tax Regs., were interpreted to
govern unreimbursed volunteer expenses, they would require

[27] In *Cavalaris v. Commissioner*, T.C. Memo. 1996–308, we cited sec. 1.170A–13(a), Income
Tax Regs., without further analysis, in considering the deductibility of unreimbursed volunteer
expenses.

[28] For contributions of $250 or more, sec. 1.170A–13(f)(1), Income Tax Regs., requires the tax-
payer to acquire and maintain the charity's written acknowledgment of the contribution. Such
an acknowledgment must include "The amount of any cash the taxpayer paid and a description
(but not necessarily the value) of any property other than cash the taxpayer transferred to the
donee organization". Sec. 1.170A–13(f)(2), Income Tax Regs. However, for taxpayers who incur
unreimbursed expenditures incident to the rendition of charitable services, sec. 1.170A–13(f)(10),
Income Tax Regs., provides that the required acknowledgment need only include a "description
of the services provided by the taxpayer", so long as the taxpayer has adequate records under
sec. 1.170A–13(a), Income Tax Regs., "to substantiate the amount of the expenditures".

[29] The IRS treats unreimbursed volunteer expenses as cash contributions in instructing tax-
payers how to complete their returns. The IRS instructions for Form 8283, Noncash Charitable
Contributions, instruct taxpayers not to use the form for out-of-pocket volunteer expenses. In-
stead the instructions tell taxpayers to treat out-of-pocket expenses as cash contributions. IRS
instructions, however, generally carry no authoritative weight. See *Merlo v. Commissioner*, 126
T.C. 205, 211 n.10 (2006), affd. 492 F.3d 618 (5th Cir. 2007); *Zimmerman v. Commissioner*, 71
T.C. 367, 371 (1978), affd. without published opinion 614 F.2d 1294 (2d Cir. 1979).

information that would not be helpful in a subsequent audit or litigation about the propriety of a charitable-contribution deduction. See *Bond v. Commissioner*, 100 T.C. 32, 41 (1993) ("the reporting requirements of section 1.170A–13, Income Tax Regs., are helpful to * * * [the IRS] in the processing and auditing of returns on which charitable deductions are claimed"). The rules for non-money contributions require a taxpayer who lacks a donee receipt to keep written records of:

- the value of the property,
- the cost of the property,
- any previous contributions by the taxpayer of a partial interest in the contributed property, and
- any restrictions the taxpayer has placed on the use of the property.

Sec. 1.170A–13(b)(2)(ii), Income Tax Regs. [30] These facts are generally irrelevant to the deductibility of unreimbursed volunteer expenses. Such expenses involve a monetary payment by the taxpayer for which the taxpayer seeks a deduction equal to the monetary outlay. We conclude that the recordkeeping requirements for money contributions in section 1.170A–13(a), Income Tax Regs., govern Van Dusen's foster-cat expenses. [31]

---

[30] If a taxpayer contributing non-money property has a receipt from the donee organization, the receipt need only contain: (i) the name of the donee, (ii) the date and location of the contribution, and (iii) "A description of the property in detail reasonably sufficient under the circumstances." Sec. 1.170A–13(b)(1), Income Tax Regs. The receipt need not contain certain information (listed above) that is required by sec. 1.170A–13(b)(2)(ii), Income Tax Regs. Because Van Dusen lacks a donee receipt, we use the rules for non-money contributions without a receipt as the point of comparison.

[31] We recognize that the recordkeeping rules for money contributions are also not well suited to unreimbursed volunteer expenses. The rules for money contributions provide that records showing the name of the donee are acceptable substitutes for canceled checks. Sec. 1.170A–13(a)(1)(iii), Income Tax Regs. This reflects the assumption that records showing the name of the donee provide the same information as canceled checks. This assumption is correct for money contributions because a canceled check reflects the name of the donee. But for unreimbursed volunteer expenses, a canceled check reflects the name of the payee, not the donee. Thus a record of the name of the donee would not reflect the same information as a canceled check. Van Dusen's documents do not indicate the name of the donee.

We hold that the recordkeeping requirements of sec. 1.170A–13(a), Income Tax Regs., govern unreimbursed volunteer expenses of less than $250 in order to avoid the implausible result that such expenses would be free from recordkeeping requirements. Of the two provisions that could govern unreimbursed volunteer expenses of less than $250, we believe sec. 1.170A–13(a), Income Tax Regs., is more suitable for the reasons stated in the text.

b. *Van Dusen's Documentation Meets the Recordkeeping*
   *Requirements of Section 1.170A–13(a), Income Tax*
   *Regs.*

Section 1.170A–13(a)(1), Income Tax Regs., requires the taxpayer to maintain one of the following:

(i) A cancelled [sic] check.

(ii) A receipt from the donee charitable organization showing the name of the donee, the date of the contribution, and the amount of the contribution. A letter or other communication from the donee charitable organization acknowledging receipt of a contribution and showing the date and amount of the contribution constitutes a receipt * * * .

(iii) In the absence of a canceled check or receipt from the donee charitable organization, other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution.

In determining whether Van Dusen has substantiated her payments for veterinary services, pet supplies, cleaning supplies, and utilities, we look to the following records that Van Dusen introduced into evidence: check copies,[32] bank account statements, credit card statements, a Thornhill Pet Hospital client account history, a Costco purchase history, Pacific Gas & Electric invoices, a Waste Management payment history, and an East Bay Municipal Utility District billing history.[33] We find that Van Dusen's records are sufficient to substantiate all her foster-cat expenses of less than $250.

Van Dusen's documents are not canceled checks[34] or receipts from the donee charitable organization, Fix Our Ferals. Nor are her documents "other reliable written records", which are defined by section 1.170A–13(a)(1)(iii), Income Tax Regs., as records that show "the name of the donee, the date of the contribution, and the amount of the contribution." Van Dusen's documents do not show the name of the donee, which is Fix Our Ferals. Instead they show the names of the entities she paid. Van Dusen's documents do

---

[32] See *supra* note 12 for an explanation of why we refer to the documents as "check copies".

[33] We assume all of these documents have been properly "[maintained]" within the meaning of sec. 1.170A–13(a)(1), Income Tax Regs. The IRS does not argue that the "maintain" requirement means Van Dusen had to keep records continuously from the time she incurred the expenses. Rather, the IRS contends that Van Dusen's documents do not satisfy the substantiation requirements regardless of how long they were kept.

[34] A canceled check is "A check bearing a notation that it has been paid by the bank on which it was drawn." Black's Law Dictionary 269 (9th ed. 2009). Van Dusen's check copies bear no such notation and thus are not canceled checks. Rather, they are photocopies of carbon copies of the original checks. See *supra* note 12.

not show the amounts of her contributions to Fix Our Ferals. Instead they show the amounts of her cat-care expenses, which invariably have a nondeductible component because some of her cats were pet cats. Thus Van Dusen's documents do not strictly comply with section 1.170A–13(a)(1), Income Tax Regs.

Nonetheless, we find that Van Dusen has substantially complied with section 1.170A–13(a)(1), Income Tax Regs. We analogize Van Dusen's situation to that of the taxpayer in *Bond v. Commissioner*, 100 T.C. 32 (1993). In *Bond*, a taxpayer donated two blimps to a charitable organization. *Id.* at 33. Section 1.170A–13(c)(2)(i), Income Tax Regs., required him to obtain a document appraising the two blimps. *Id.* at 38–39. The regulation required that the appraisal document contain specific items of information. *Id.* The taxpayer failed to obtain a separate written appraisal. *Id.* at 34. However, the taxpayer attached a Form 8283, Noncash Charitable Contributions, on which an appraiser had recorded information about the value of the two blimps. *Id.*

*Bond* distinguished between a regulatory requirement relating to "the substance or essence of the statute", strict adherence to which is mandatory, and a requirement that is merely "procedural or directory", which may be satisfied by substantial compliance. *Id.* at 41. *Bond* held that the reporting requirements of section 1.170A–13, Income Tax Regs., are directory and require only substantial compliance. *Id.* The Court further held that because substantially all of the information required in an appraisal document was recorded on the Form 8283, the taxpayer had complied with the regulatory requirement to obtain an appraisal document. *Id.* at 42.

Returning to Van Dusen, the relevant regulatory requirement is section 1.170A–13(a)(1), Income Tax Regs., which allows a taxpayer to rely on canceled checks to record contributions of money. Under *Bond*, Van Dusen's documents are legitimate substitutes for canceled checks. Van Dusen produced records of her expenses which contained all of the information that would have been on a canceled check. Her records show the name of the payee, the date of the payment, and the amount of the payment. (A canceled check by a volunteer generally reflects the name of the payee, but it does not reflect the name of the charitable organization to which

the volunteer's services are rendered. It might be useful for the volunteer to keep records of the name of the charitable organization, but it is not our role to impose such a requirement in the absence of a specific regulatory requirement.) Therefore, Van Dusen has substantially complied with section 1.170A–13(a)(1), Income Tax Regs.

An objection might be raised that the substantial compliance doctrine should not apply to Van Dusen because section 1.170A–13(a)(1), Income Tax Regs., specifies what records are valid substitutes for canceled checks. The regulation states that the taxpayer can maintain a canceled check, a receipt from the donee, or "In the absence of a canceled check or receipt from the donee charitable organization, other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution." *Id.* In specifying what documents are valid substitutes for canceled checks, though, the regulation was plainly not written with unreimbursed volunteer expenses in mind. It requires substitute records to reflect the name of the donee, even though canceled checks for unreimbursed volunteer expenses would reflect the name of the payee. It requires substitute records to reflect the amount of the contribution, even though canceled checks for unreimbursed volunteer expenses often reflect a nondeductible component.[35] Van Dusen's documents fail to qualify as "other reliable written records" only because the regulation was not written with unreimbursed volunteer expenses in mind.[36] This failure should not preclude the application of the substantial compliance doctrine in *Bond*.

[35] As noted above, sec. 1.170A–13(f)(10), Income Tax Regs., partially incorporates the requirements of sec. 1.170A–13(a), Income Tax Regs., for unreimbursed volunteer expenses of $250 or more. See *supra* note 28. In what appears to be an attempt to correct the inadequacies of sec. 1.170A–13(a), Income Tax Regs., as a recordkeeping requirement for unreimbursed volunteer expenses, sec. 1.170A–13(f)(10), Income Tax Regs., specifies that sec. 1.170A–13(a), Income Tax Regs., need be satisfied only to the extent necessary "to substantiate the amount of the *expenditures*". (Emphasis added.)

[36] "[O]ther reliable written records" must, by definition, also be "reliable". Their reliability is determined by the circumstances, including whether the records were contemporaneous and whether the records were regularly kept. Sec. 1.170A–13(a)(2)(i), Income Tax Regs. Furthermore, the information required by sec. 1.170A–13(a)(1)(iii), Income Tax Regs. (the "other reliable written records" provision), must be stated on the taxpayer's return if required by the return form or its instructions. Sec. 1.170A–13(a)(2)(ii), Income Tax Regs.

Van Dusen's records satisfy the reliability requirement of sec. 1.170A–13(a)(2)(i), Income Tax Regs. The documents were made contemporaneously and in the course of regular recordkeeping. The check copies faithfully duplicate the original checks, which Van Dusen wrote in 2004. Van Dusen's credit card company, Van Dusen's bank, and Pacific Gas & Electric issued her statements in 2004 based on electronic compilations of transactions at the time. Similarly, Thornhill

Continued

We conclude that Van Dusen has substantiated all the veterinary, pet supply, cleaning supply, and utility expenses of less than $250. As discussed earlier, these expenses must be adjusted to exclude amounts not attributable to foster-cat care. After such adjustments are made, Van Dusen can deduct 90 percent of her less-than-$250 veterinary and pet supply expenses and 50 percent of her less-than-$250 cleaning supply and utility expenses.

2. *Van Dusen Has Not Met the Substantiation Requirements for Her Foster-Cat Expenses of $250 or More.*

To claim a charitable-contribution deduction of $250 or more, the taxpayer must substantiate the contribution with a contemporaneous written acknowledgment from the donee organization. Sec. 170(f)(8)(a); sec. 1.170A–13(f)(1), Income Tax Regs. A taxpayer who incurs unreimbursed expenses "incident to the rendition of services" is treated as having obtained a contemporaneous written acknowledgment if the taxpayer: (1) "Has adequate records under * * * [section 1.170A–13(a), Income Tax Regs.] to substantiate the amount of the expenditures", and (2) acquires a contemporaneous statement from the donee organization containing:

(A) A description of the services provided by the taxpayer;
(B) A statement of whether or not the donee organization provides any goods or services in consideration, in whole or in part, for the unreimbursed expenditures; and
(C) [A description and good faith estimate of the value of any goods or services provided by the donee organization].
[Sec. 1.170A–13(f)(10), Income Tax Regs.]

For the statement to be contemporaneous, the taxpayer must obtain the donee's statement on or before the earlier of: (1)

Pet Hospital, Costco, Waste Management, and East Bay Municipal Utility District recorded Van Dusen's payments in their computer systems in 2004, and later retrieved the data in response to her customer service inquiries.

Van Dusen's tax return did not need to disclose any information required by sec. 1.170A–13(a)(1)(iii), Income Tax Regs. Although Van Dusen submitted Form 8283, which requires the name of the donee, the date of the contribution, and the amount of the contribution—information required under sec. 1.170A–13(a)(1)(iii), Income Tax Regs.—Van Dusen did not need to file this form. The instructions for Form 8283 explicitly state that it does not apply to out-of-pocket expenses incurred for volunteer work. (Although IRS form instructions are generally not binding, see *supra* note 29, we cite the form instructions here because sec. 1.170A–13(a)(2)(ii), Income Tax Regs., directs the taxpayer to furnish the information required by sec. 1.170A–13(a)(1)(iii), Income Tax Regs., on the taxpayer's return if required by the return form or its instructions.) On her tax return, Van Dusen simply had to enter the total amount of her monetary contributions (including out-of-pocket expenses)—which she did.

the date the return was filed, or (2) the due date (including extensions) for filing the return. Sec. 1.170A–13(f)(3), Income Tax Regs. [37]

Van Dusen has not satisfied the contemporaneous written acknowledgment requirement. The due date for filing her 2004 return was April 15, 2005, and she filed her return on January 25, 2007. The earlier of the two dates is April 15, 2005. The date by which Van Dusen was required to obtain the donee's statement is therefore April 15, 2005. Van Dusen had not obtained any written acknowledgment of her services from Fix Our Ferals by April 15, 2005. Even by trial, she had failed to obtain from Fix Our Ferals a statement with the information required by section 1.170A–13(f)(10), Income Tax Regs. [38]

Since Van Dusen lacks the appropriate written acknowledgment from Fix Our Ferals, she has not substantiated and cannot deduct any foster-cat expenses of $250 or more. [39] Neither party, however, has identified which portions of the claimed deduction are attributable to foster-cat expenses of $250 or more. It seems to us that the proper identification procedure is to multiply each cat-care expense by the relevant percentage (90 percent or 50 percent) and see whether the resulting amount equals or exceeds $250. Any amount less than $250 is deductible, and any amount that is $250 or

[37] The regulations do not specifically require the taxpayer to attach the contemporaneous written acknowledgment to the tax return.

[38] Sec. 1.170A–13(f)(10)(ii), Income Tax Regs., specifies the particular information required to be on the donee statement. Van Dusen attempted to submit a letter written by the Fix Our Ferals treasurer in 2008 as proof of contemporaneous written acknowledgment. See Ex. 3–P. At trial we sustained the IRS's hearsay objection to the letter. Van Dusen filed a motion for reconsideration of the evidentiary ruling. We denied the motion. The letter does not qualify for any hearsay exception. And regardless, it fails to meet the requirements of sec. 1.170A–13(f)(10)(ii), Income Tax Regs.

[39] In *Cohan v. Commissioner*, 39 F.2d 540, 543–544 (2d Cir. 1930), the Court of Appeals for the Second Circuit held that if the taxpayer has proven deductible expenses but the precise amount remains uncertain, courts can estimate the amount of such expenses. The *Cohan* rule does not allow Van Dusen to deduct any foster-cat expenses of $250 or more. Sec. 170(f)(8) and sec. 1.170A–13(f), Income Tax Regs., impose specific substantiation requirements on charitable contributions of $250 or more. The *Cohan* rule does not relieve taxpayers of substantiation requirements that Congress has specifically laid out. See *Addis v. Commissioner*, 118 T.C. 528, 537 (2002) (denying charitable contribution deduction because taxpayer's contemporaneous written acknowledgment did not comply with sec. 170(f)(8)), affd. 374 F.3d 881 (9th Cir. 2004); *Stussy v. Commissioner*, T.C. Memo. 2003–232 (disallowing deductions for residential expenses for the portions of a house used by charity because taxpayer failed to provide contemporaneous written acknowledgment); see also *Sanford v. Commissioner*, 50 T.C. 823, 827–828 (1968) (*Cohan* rule inapplicable when taxpayer has not satisfied sec. 274(d) substantiation requirements), affd. per curiam 412 F.2d 201 (2d Cir. 1969).

more is not deductible. By our calculations, the following foster-cat expenses are $250 or more:

| Payee | Date[1] | Document | Amount listed on document | Amount consti-tuting a foster-cat expense |
|---|---|---|---|---|
| Thornhill Pet Hospital | 1/17/04 | Thornhill Pet Hospital client account history | $1,532.68 | $1,379.41 |
| Thornhill Pet Hospital | 2/17/04 | Bank statement[2] | 306.78 | 276.10 |
| Pet Vet Pet Food | 5/30/04 | Credit card statement | 417.54 | 375.79 |
| St. Louis Vet Clinic | 7/28/04 | Credit card statement | 477.00 | 429.30 |
| Pet Vet Pet Food | 9/21/04 | Check No. 1428 | 687.81 | 619.03 |
| St. Louis Vet Clinic | 10/16/04 | Check No. 1442 | 309.00 | 278.10 |
| Thornhill Pet Hospital | 11/06/04 | Credit card statement[2] | 723.25 | 650.93 |
| Pet Vet Pet Food | 11/11/04 | Check No. 1462 | 332.81 | 299.53 |
| Berkeley Dog and Cat Hospital | 11/15/04 | Bank statement | 500.00 | 450.00 |
| Thornhill Pet Hospital | 11/30/04 | Credit card statement[2] | 320.54 | 288.49 |

[1]For credit card statements, dates refer to the transaction date, not the posting date.
[2]Also reflected on the Thornhill Pet Hospital client account history.

Each of the remaining foster-cat expenses is less than $250. [40]

## V. *Effect of Section 280A*

Section 280A(a) provides that for individual taxpayers "no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." Section 280A(b) contains an exception to section 280A(a). It provides: "Subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income-producing activity)." The IRS argues that section 280A forbids Van Dusen from claiming a charitable-contribution deduction for a portion of her household utility bills. We hold that section 280A does not affect the deductibility of Van Dusen's expenses. Van Dusen's expenses would be deductible without regard to any connection with a trade or business. See sec. 280A(b). Van Dusen's trade or business was legal services. She worked as an attorney and derived all her income from legal jobs. She derived no income or expectation of income

[40]On the basis of Van Dusen's credit card statement, we find that the $292.15 payment to Bay Area Veterinary Specialist on Nov. 29, 2004, was offset by a credit of $35.97 that was posted on Nov. 30, 2004. Since Van Dusen's total payment to Bay Area Veterinary Specialist was $256.18 ($292.1 – $35.97), the amount of her foster-cat expense was $230.56 (90 percent of $256.18). Therefore, we categorize this expense as less than $250.

from fostering cats. Therefore, the utility bills are covered by the exception in section 280A(b).

## VI. *$100 Check to Island Cat Resources and Adoption*

Van Dusen's documentation includes a $100 check to "ICRA" (Island Cat Resources and Adoption) with "fundraiser" in the memo line. Island Cat Resources and Adoption is a section 170(c) organization. See *supra* note 17 and accompanying text. We hold that $100 is deductible as a charitable contribution to Island Cat Resources and Adoption. Van Dusen testified that the check was a donation to the charitable organization, and her documentation meets the record-keeping requirements of section 1.170A–13(a), Income Tax Regs.

To reflect the foregoing,

*Decision will be entered under Rule 155.*